This is a suit by a reputable member of the Shreveport Bar seeking to recover a fee for services rendered to the defendant. The facts are as follows:
On or about June 1, 1939, the defendant applied to the Jefferson Standard Life Insurance Company of Greensboro, North Carolina, for a loan of $35,000 to be secured by a mortgage on the following described property: "Lots One to Five, inclusive, Thatcher's Subdivision, City of Shreveport, as per plat of record in Conveyance Book `T', page 476, Caddo Parish, Louisiana, including a certain 10-foot strip lying between Lots 1, 2 and 3 and Lot 4, together with all buildings and improvements thereon."
On July 7, 1939, the Jefferson Standard Life Insurance Company addressed the following letter to the plaintiff, one of its approved attorneys in the city of Shreveport:
"Dear Mr. Johnson:
 "Re: Loan J.L. McCook et ux.
"We have approved a loan of $25,000.00 to the above applicants of your city on property described as follows:
"Lots 1, 2, 3, 4, 5 and 10-foot closed alley, Thatcher's Subdivision. Being lots on which is located two two-story and one three-story brick and wood business building, situated at 1608 Fairfield Avenue, Shreveport, Caddo Parish, La.
"We enclose the necessary blank forms and shall thank you to prepare papers for a loan of $25,000, payable in 12 and one-half years, interest at 6%, payable quarterly and with a 2% quarterly curtailment of the principal.
"We are to be furnished with an adequate amount of fire and windstorm insurance when this loan is closed. All paving and other special assessments, including the future unmatured installments, are to be paid in full.
"The borrowers are to have the non-cumulative option of doubling the principal curtailments on any interest paying date.
"Please let us have a plat of survey prepared according to the Lawyers Title Instructions.
"As we are to obtain an assignment of income of the mortgaged property, you will have the enclosed form completed and executed. You will please ascertain that there has been no modification, including any anticipation of the rents, of the written terms of any lease. We are to obtain the assignment of a satisfactory lease with the McCook Funeral Home, so please see that we are furnished with a certified copy or duplicate original for our examination.
"The lease to be assigned is supposed to convey the chattels as security for the rent. You will please examine it to see that this is done and we should like for you to advise us as to the efficacy of such a procedure to convey to us a lien on the chattels in case there is a default under the lease.
"We are to obtain a first lien on the chattels located in the Funeral Home and used in connection therewith. You will please furnish us with satisfactory evidence of the priority of our lien, including an affidavit as to ownership from the borrower. The chattel lien is to be included in the mortgage by means of general language, which should be supplemented by an itemized list of the major items, covering all chattels at present located on the mortgaged property and any added during the life of the loan.
"We understand that the borrowers have a complete abstract of title to this property and that in order to save expense they would like for us to waive our customary requirement that the loan be closed on the basis of title insurance. It would appear from a cursory examination of the file that there will be no particularly difficult title *Page 361 
question and that, therefore, we need not require title insurance. If, however, in your examination of the title or in our Counsel's examination, a question is discovered against which either you or they think we need the protection of title insurance, we are reserving the privilege of asking for it as this is a larger transaction than we would ordinarily want to handle without requiring title insurance.
"Inasmuch as the applicants are to pay all expenses incurred in securing this loan, we are sending a copy of this letter to Mr. McCook so that you may be authorized to prepare the necessary papers.
"Yours very truly,
"John B. Higby "Mortgage Loan Dept."
A copy of this letter was mailed to defendant and to the two representatives of the Insurance Company in Shreveport. Just when defendant received a copy is not certain and his testimony is somewhat conflicting on this point. However, he contends he did not receive the copy of the letter until after the work had been performed by plaintiff and that he at no time ever agreed to accept a loan made in accordance with the requirements of the security to be furnished, as set out in the letter.
Mr. Hill, a representative of the Insurance Company, was active in securing the loan to defendant. His commission, if the loan was made, would ordinarily have been 2 per cent of the amount of the loan. When Mr. Hill received a copy of the letter above quoted, he again took the matter up with defendant and after some discussion between them, defendant agreed to accept a loan of $25,000, provided the expense of putting it through did not exceed $350. Mr. Hill agreed to reduce his commission from $500 to $200 and he and defendant then went to plaintiff's office and after considerable discussion of the fee question, plaintiff and defendant agreed that plaintiff's fee would be $150 and defendant instructed plaintiff to proceed to close out the loan. This was on July 7th, four days after the letter was written.
Plaintiff contends there was no condition as to payment of the fee when services were completed and defendant contends that the payment of the fee was conditioned upon the loan going through in accordance with his original application, which did not call for the chattels and rolling stock of the Funeral Home, which were located on the property offered as security, to be included.
Defendant further contends that he at all times made it plain and clear that the McCook Bros. Funeral Home, Inc., a going concern, owned entirely by J.L. McCook and operated in the building on the premises offered as security, was not to be included or involved in any way with the loan. We are convinced he never intended or consented to the Funeral Home being included in the mortgage, whether he made it clear to plaintiff or not. He did make it clear to the representative of the Insurance Company, and there are many obvious reasons why he would not want the Funeral Home obligated.
When the mortgage was prepared and ready for execution, it contained the following provision: "Also appeared McCook Bros. Funeral Home, Inc., a Louisiana corporation, domiciled at Shreveport, Caddo Parish, Louisiana, represented herein by said J.L. McCook, President and sole stockholder, who declared that the personal property and equipment of said corporation are included in this mortgage as further security for the payment of the above described mortgage note of J. Lehman McCook;" and a place provided just below the space for the signature of J.L. McCook, for McCook Funeral Home, Inc., by "__________, President and only stockholder." In other words, the mortgage was prepared to be executed by J.L. McCook and the Funeral Home as mortgagors. This provision of the mortgage is what broke the deal. Defendant refused to execute it with that provision in it and refused to let the Funeral Home, a corporation, become obligated as mortgagor. We are sure that if defendant had known in advance that the mortgage was to include the Funeral Home as mortgagor, the negotiations would have ended then as they did end upon his learning it; and plaintiff would never have been called upon to render the services for which he is seeking payment.
It is evident to our minds that all the dealings regarding the loan were between Mr. Hill and the defendant, with the exception as to the agreement as to the amount of fee between plaintiff and defendant. It is likewise evident that defendant considered plaintiff an attorney for the Insurance Company and not his attorney. He knew from the written application that he would have to pay the attorney's fee and his dealings with plaintiff were only to have an agreement as to the amount. The application for the loan provided that the applicant should *Page 362 
pay the attorney's fees if the loan was executed or if the title was found defective, or if he withdrew the application. The amount of the fee is not fixed in the application. The title to the property was not defective. The loan was not executed in accordance with the application nor was it withdrawn. It was refused because it failed to comply with the application and contained provisions which defendant had never intended to be included and to which he had never agreed.
The Insurance Company has a list of approved attorneys in this locality and when an application for a loan is filed, one of these attorneys is selected by the company and the papers forwarded to him with instructions to get in touch with the applicant and secure his authorization to proceed with the services required of the attorney by the Insurance Company. The services performed by the attorney are all under instructions from the Insurance Company. It is not contended that without a separate and distinct contract the attorney could collect from the applicant if the loan did not go through, except for the two reasons above set out, viz., defective title or withdrawal of the application without cause by the applicant. It is clear to us that was what was in the mind of defendant and his only reason for contacting plaintiff was to fix the fee in accordance with those provisions of the application. It evidently was not his purpose or intention to secure plaintiff as a special attorney to represent him in the matter for the reason plaintiff had already been selected by the Insurance Company to represent it at defendant's cost.
We are of the opinion that the application and dealings of defendant with the Insurance Company through its representatives cannot be separated, as plaintiff contends, from the dealings of defendant with the plaintiff regarding the amount of fee to be charged and, if not, certainly defendant does not owe a fee in any amount. If it could be separated and the case determined entirely on what was said and done when plaintiff and defendant agreed upon a fee and plaintiff was instructed to proceed with closing out the loan, then we have a situation where plaintiff states that there was nothing said by the defendant to the effect that the fee would not be paid if the loan did not go through, and defendant says there was such an agreement. There clearly was no meeting of minds.
The lower court had the following to say on this question:
"We do not recognize any issue of veracity here. Mr. Johnson is a most reputable member of this Bar in whom the Court has complete confidence. On the other hand, we have no reason to question the good faith or truthfulness of Mr. McCook, whose position seems to be thoroughly reasonable and is supported by the testimony of Hill and the terms of the application. We think it is a situation where Johnson thought one thing and McCook thought another. Of course, the burden of proof is on the plaintiff, who is suing on a contract, to prove that contract. We do not believe the record in this case supports that burden.
"There is accordingly judgment for defendant and against plaintiff, rejecting plaintiff's demands at his cost."
The judgment of the lower court is correct, and is affirmed, with costs.